**D. C. TRANSIT SYSTEM, INC. and Washington, Virginia and Maryland Coach Company, Petitioners,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,**

**A. B. & W. Transit Co., and the Gray Line, Inc., Intervenors.**

**No. 22893.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1970.

Decided May 21, 1970.

---

Mr. Manuel J. Davis, Washington, D. C., with whom Mr. Paul M. Cowgill, Jr.,

Washington, D. C., was on the brief, for petitioners.

Mr. Douglas N. Schneider, Jr., Gen. Counsel, Washington Metropolitan Area Transit Commission, for respondent.

Mr. S. Harrison Kahn, Washington, D. C., for intervenors. Mr. Renn C. Fowler, Washington, D. C., also entered an appearance for intervenors.

Before McGOWAN, ROBINSON and MacKINNON, Circuit Judges.

McGOWAN, Circuit Judge:

Before us for review are two orders of the Washington Metropolitan Area Transit Commission denying authority to petitioners, D. C. Transit System, Inc., and Washington, Virginia and Maryland Coach Company, Inc., to conduct through route and joint fare sightseeing tours in the District of Columbia and the Washington Metropolitan Area. After petitioners filed their agreement for the proposed services and their joint tariff with the Commission, two other carriers, also certificated to provide sightseeing services, asked the Commission to suspend the tariff and to institute an investigation of its lawfulness.

The matter was set for hearing by the Commission, and the protesting carriers intervened. Following this hearing, the Commission, treating the filing by petitioners as an application for additional certificate authority, in Order No. 888 refused to approve the proposed service. Petitioners thereafter moved for reconsideration and, in an order (No. 920) that discussed at greater length the Commission's view of the merits of petitioners' filing, the Commission refused to reconsider its earlier action.

Each petitioner possesses a certificate of public convenience and necessity to conduct sightseeing tours (and other transit services not relevant here) within specified geographic zones. Certificate No. 5, issued on August 12, 1964, authorizes petitioner D. C. Transit to operate sightseeing tours "[f]rom points in the District of Columbia to points in the Metropolitan District." Certificate No. 4, issued that same date, permits petitioner Coach Company to conduct "special operations * * * [b]etween points on its regular routes in Virginia * * * and points within the District of Columbia. * * * "

Through an agreement and a joint tariff initially filed with the Commission on April 4, 1968, petitioners sought to establish a joint tour service encompassing both these geographic zones. Although the agreement, and the testimony elucidating it, are far from clear and comprehensive, generally it appears that the tours were to proceed in the following manner: Individual passengers would be picked up along the regular routes of Coach Company in Virginia. The narrated tour would begin immediately. Passengers would continue on Coach Company's buses to D. C. Transit's sightseeing office on New York Avenue in the District of Columbia. The passengers would there change to a D. C. Transit bus, and continue the tour. At the close of the tour, the Virginia passengers would return to a Coach Company bus, and then be taken back to points in Virginia.

Within the confines of this general description are many specific questions about the precise nature of this joint tour service which are left unresolved by the evidence presented to the Commission. The Commission felt it unnecessary to resolve these questions because of its conclusion, in Order No. 888, that there was insufficient need, in terms of the public convenience and necessity, for such a joint tour service, whatever its form. Because we disagree with the Commission's ruling, in Order No. 920, that the creation of any through route and joint fare sightseeing service requires the Commission's approval, we remand this case to the Commission so that it can explore in a meaningful way the issues raised by intervenors' request for suspension of the joint tariff and

**200**

an investigation of the lawfulness of the transportation services it offers.[1]

## I

Petitioners and Commission disagree as to which of two provisions of the Washington Metropolitan Area Transit Regulation Compact[2] should properly have governed the proceeding before the Commission. Subsection 4(a) of the Compact requires that a carrier possess a certificate of public convenience and necessity authorizing the transportation business of that carrier. The Commission dealt with petitioners' filings as if they constituted a joint application for new certificate authority, and proceeded to determine whether the public convenience and necessity required such a grant. *See* Compact, Subsection 4(b). Petitioners, on the other hand, argue that the agreement established a through route and joint fare service authorized by their existing certificates and by Subsection 7(a) of the Compact, which encourages the establishment of such service,[3] and thus that no additional certification was necessary. They assert, therefore, that the proceeding below was initiated by the filing with the Commission of a tariff of the joint fares to be charged for the through route service, *see* Compact, Subsection 5(a), and that any Commission inquiry should have been only to determine whether the "divisions of any joint fare * * * are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial * * *" pursuant to Subsection 7(c) of the Compact.

While this issue is the clear focus of the parties' briefs and oral argument in this court, it was not clearly identified at the Commission level until the proceedings there neared completion. The Commission's position, namely, that its prior approval was necessary for any through service, was constant, but petitioners were slow to contest it. Petitioners' initial letter, submitting the tariff and a copy of the agreement to the Commission, appeared to coincide with the Commission's position: "A copy of the underlying agreement between the two carriers is also attached for your approval."

The briefs and testimony by representatives of petitioners thereafter assumed the ambiguous position of claiming that their existing certificates provided a sufficient underlying authority, while not explicitly denying that prior approval by the Commission was necessary to the offering of the through service. Counsel for petitioners argued at the Commission hearing that

> The tariff itself, as Mr. Kahn pointed out, * * * can be introduced later, or now, as far as this proceeding is concerned. It is merely going to establish the rates of fare that will eventually be charged in the event we are authorized to render this joint service.

> Now, I think I have answered both questions. I think the letter addressed to me on the 30th puts me on notice to come here and tell exactly what it is I am going to do, but this is not a new application for new authority by either company. We both contend we

1. The Commission argues that there is not now before this court any Commission ruling that the Commission must invariably give its prior approval to the creation of a through route service. While Order No. 888 considered only the need for the proposed service, Order No. 920, in denying reconsideration, did interpret the Compact to require approval of through route services. Moreover, the Commission's initial ruling, in Order No. 888, that the petitioners had not shown the public need for their proposed service can only be relevant if it was proper to

apply the public convenience and necessity standard.

2. The Compact, Public Law 86-794. 74 Stat. 1031 (1960), is found in the District of Columbia Code following D.C. Code § 1-1410, the provision authorizing the creation of such a transit compact.

3. Subsection 7(a) reads that "[i]n order to encourage and provide adequate transit service on a *Metropolitan District-wide* basis, any carrier may establish through routes and joint fares with any other carrier * * *."

have the authority at the present time, and all we want to do is join it up. This is it in a nutshell.

█ This statement, at best, appears to have looked in opposite directions. In their application for reconsideration of the Commission's first order, however, petitioners at long last clearly argued that no Commission approval was required for their proposed through route service. It was this application that prompted the Commission, in Order No. 920, to hold, first, that petitioners should be estopped from arguing that no authorization was necessary since they had initially sought the Commission's approval; and, second, that the Commission should be regarded as endowed with the power to determine what through route services, if any, would be permitted.[4] We are not impressed with the estoppel claim, since it is clear that, before the Commission proceedings were finally closed, petitioners managed to make their position manifest.

## II

█ Section 7 of the Compact does give to the Commission some authority with respect to through route services, but it creates, we think, a scheme of regulatory authority unlike the one the Commission purports to perceive. Subsection 7(a), without reference to the convenience and necessity standard, is declarative of "any carrier's" right to establish through routes and joint fares with other carriers. Subsection (b) begins with the words "[w]henever required by the public convenience and necessity," and goes on to invest the Commission with power to direct the establishment of through route service "upon complaint or upon its own initia-

tive." Subsection (b), in contrast to (a), requires a finding of public convenience and necessity when the Commission is ordering unwilling carriers to create through routes and joint fares. The convenience and necessity standard is, in this regulatory scheme of things, a limitation on the Commission's, as distinct from the carriers', power to initiate a through route service.

█ In its Order No. 920, the Commission expressed concern about its ability, if it lacked authority to disapprove a through route voluntarily established, to regulate traffic patterns and competitive forces within the Metropolitan Area. The Compact does, however, provide other means to deal with these problems. Subsection 4(a) would, of course, continue to require Commission approval (i. e., a certificate of public convenience and necessity) for the underlying services that are sought to be availed of to create a through route; and, if the Commission has reason to doubt the adequacy of the underlying certificate authority to support the through route service, it can suspend the joint tariff and initiate an investigation of that adequacy. Moreover, Subsection 4(g) allows the Commission to move at any time to suspend or revoke the certificate of any carrier not complying with the terms of its certificate or with Commission regulations.

██ Subsection 7(c) also allows the Commission to establish a reasonable division of the joint fares among the interconnecting carriers, whenever it finds the proposed or existing division to be unreasonable. This gives the Commission power to prevent any undue subsidization of one carrier by the carrier with which it is establishing the through route service.[5] It also appears that

---

4. Intervenors presented a third, and intermediate, position. They argued that Subsection 7(a) of the Compact, which authorizes the creation of through routes for regular route services, does not cover through route *sightseeing* tours. The Commission did not adopt this distinction in Order No. 920, nor do we find any recognition of such a distinction in the Compact.

5. By stressing that petitioner Coach Company is a wholly-owned subsidiary of petitioner D.C. Transit, the Commission suggests that this was, perhaps, its primary concern. Petitioners do not deny that their tariff was filed with the Commission, and subject to its usual powers of suspension and investigation.

Subsection 7(b) authorizes the Commission, in appropriate cases, to compel one party to an existing through route service to establish additional through route agreements with other carriers if that is their only means of developing competing through route services.

### III

■ Where transportation services have been independently authorized, the concept of through route service allows that they be joined so that two additional benefits can result: first, a more convenient service can be provided to passengers who would otherwise have to buy several tickets and devise their own interconnections, and, second, a more efficient cost structure can be available to carriers that would otherwise have to duplicate several cost items.[6] At the same time, these through routes introduce few added costs into the transportation market since they allow no service greater than the certificates, used independently, would otherwise permit. However, this profitable balance is only maintained where there is a joint service that does not extend beyond the combined parameters of the independent services; and, of course, a through route service can never be a cover for operations which in fact exceed the individual certificate authorities of one or both carriers.

■ Because the Commission hearings were not sufficiently informed by an accurate concept of through route service, we are unable to determine, from the present record, whether the through route and joint fare sightseeing operations contemplated by petitioners constitute such a service. Several questions remain to be answered as to precisely how the through route operations are to be conducted in respect of such matters as deviation from regular routes to pick up passengers, interconnection points, and equipment utilization.[7] Thus we set aside Order Nos. 888 and 920, and remand this case to the Commission to determine whether the petitioners' agreement establishes a true through route service within the meaning of Section 7(a). That, however, is the issue to be pursued,[8] and additional certificate authority, measured by public convenience and necessity, comes into play only to the extent that the proposed operations are found to go beyond what the Compact comprehends within Section 7(a).

It is so ordered.

---

6. The concept of a through route service that can be established by the combination of several existing certificates, without further approval, has been recognized by the I.C.C. See Harry Lee Eyre, Jr., Extension—Damascus, Maryland, 106 M.C. C. 851; DeNure, Common Carrier Application, 61 M.C.C. 648. While the W.M.A. T.C. is not bound by these I.C.C. rulings, we read Subsection 7(a) of the Compact as contemplating a similar treatment of through route services within the Washington Metropolitan Area.

7. At the hearing, a Coach Company official suggested that the Coach Company buses might leave their regular routes to pick up sightseeing passengers at nearby motels. The amended agreement, filed with the Commission on April 16, 1968, also suggests that Coach Company buses might, in some cases, pick up D.C. Transit passengers and continue the tour in the District of Columbia.

8. Our remand is on the assumption that the proceeding initiated by the Commission was an affirmative response to the intervenors' request for an investigation of the lawfulness of the tariff in terms of the adequacy of the underlying certificate authority to support the operations in contemplation.